UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                   :

COMPREHENSIVE COMMUNITY DEVELOPMENT  :
CORP., d/b/a SOUNDVIEW HEALTHCARE NETWORK :      12 Civ. 0776 (PAE)
et al.,                                                        :
                                                   :      OPINION AND ORDER
                                   Plaintiffs,          :

                  -v-                                        :

KATHLEEN SEBELIUS,[1] both individually and as   :
Secretary of the U.S. DEPARTMENT OF HEALTH AND :
HUMAN SERVICES (DHHS) et al.,                        :

                                  Defendants.         :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Plaintiff Comprehensive Community Development Corp., d/b/a Soundview Health Care Network ("Soundview"), and its fellow plaintiffs[2] seek a preliminary injunction and temporary restraining order ("TRO") against defendants United States Department of Health and Human Services ("HHS"), the Health Resources and Services Administration ("HRSA"), an operating division of HHS, and their fellow defendants.[3] As preliminary relief, plaintiffs ask the Court to

---

[1] The Clerk of Court is directed to amend the caption of the case to reflect the correct spelling of Secretary Sebelius's last name.

[2] These are, as listed in the Complaint caption, the Board of Directors of Soundview, Charlotte McDuffie, Constance Bruno, and Dr. Michael Osborne. For purposes of simplicity, the Court refers herein to the plaintiffs collectively as "plaintiffs" or "Soundview."

[3] Like defendants, the Court construes plaintiffs, in suing executives at HHS and HRSA, to have sued those entities as well. *See* Defs.' Mem. 1 n.1. The individual defendants who are federal employees are: Kathleen Sebelius, Secretary of HHS; James MacRae, associate administrator of HRSA Bureau of Primary Care; Suganthi Walter, public health analyst for HRSA; Brian Feldman, grant management specialist for HRSA; Gina Capra, director of the Eastern Division

issue an order mandating that the Government redirect funds from a federal grant awarded effective February 1, 2012 to Urban Health Plan, Inc. ("Urban Health") to Soundview, which had unsuccessfully applied for the grant. Because the relief plaintiffs seek is unavailable as a matter of law, the Court denies plaintiffs' application for preliminary relief.

## I. Background[4]

### A. Federal Grants Under the Health Center Program

HRSA administers the Health Center Program ("the Program"). The Program is designed to promote the development of community-based health centers, which provide primary care services in medically underserved areas or for medically underserved populations. The Program is authorized by § 330 of the Public Health Service Act ("the Act"), as amended. *See* 42 U.S.C. § 254b. Through the Program, HRSA provides grant funding to an eligible health center in each of approximately 1,125 service areas throughout the United States. Grants are awarded for project periods of up to five years. However, funds are distributed annually, and grantees must submit budget applications every year to receive the funds for the year ahead. Important here, as the grant-making process has been described by HHS to the Court, grants are awarded for each new project through publicly announced Service Area Competitions ("SAC"). *See* Decl. of Tonya Bowers, Director of HHS's Office of Policy and Program Development ("Bowers Decl.") ¶¶ 3-4.

---

bureau of HRSA Bureau of Primary Care; Lynn Van Pelt, deputy director for Northeastern Division for HRSA; and Sherry Angwafo, financial analyst team leader for HRSA, OFAM and DFI. Plaintiffs have also sued Charlene Fleszar, legal counsel for OMIG; Matthew Babcock, assistant Medicaid inspector general for OMIG; Steven Auerbach, captain of National Health Service Corps; and Paloma Hernandez.

[4] The factual background set forth herein is derived from plaintiffs' Complaint and declarations the parties have submitted, as cited herein.

A health center that receives benefits under § 330 of the Act is thereby also eligible to receive additional federal benefits. For example, such a center, and any officer, governing board member, employee, or qualified contractor, may be deemed to be federal employees for the purposes of medical malpractice liability protection under the Federal Tort Claims Act. *See* 42 U.S.C. § 233(g). As such, the center and such personnel are immune from suit for medical malpractice claims based on conduct within the scope of their employment, and the federal government assumes responsibility for the costs of litigating such claims and the payment of any resulting settlements and judgments. To be eligible for such protection, the health center must submit what defendants identify as a "deeming application" to HRSA on an annual basis, and HRSA, acting on behalf of the Secretary of HHS, must approve the application. A health center receiving funding under § 330 is also eligible, as a Federally Qualified Health Center, to purchase outpatient prescription and non-prescription medication at reduced rates under the Act and to receive enhanced reimbursement rates from the Medicare program and the applicable state Medicaid programs. Bowers Decl. ¶¶ 5-6.

  **B. Soundview's Unsuccessful Application for the 2012-2017 Grant**

  Since 1978, Soundview has been receiving federal funds through a series of grant awards under § 330. *See* Decl. of Pls.' Counsel Ezra B. Glaser, Esq. ("Glaser Decl.") 3-4. Soundview is situated in the Soundview section of the Bronx, an urban neighborhood containing nine low-income public housing projects. Soundview has four locations within the service area. *Id*. The three-year period covered by Soundview's most recent grant began on February 1, 2009 and ended on January 31, 2012. Bowers Decl. ¶ 8 & Ex. A.

  According to HHS, on June 14, 2011, HRSA publicly announced the FY 2012 SAC funding opportunity for areas serviced by Program grantees, including Soundview, whose project

3

periods would be ending in fiscal year 2012 (October 1, 2011 through September 30, 2012). HRSA made that announcement by sending a listserve notification to all Program grantees and other entities, and by activating links to information about the SAC on the HRSA website and on the website "grants.gov." The SAC application covering the Soundview service area was available on those two websites between June 14, 2011 and September 19, 2011. Bowers Decl. ¶ 10.

As described by HHS, the application process consisted of two phases. Phase I required applicants to submit basic organizational information, including a brief budget overview and a project abstract, to grants.gov. Phase II required applicants to submit the remaining application materials, including a detailed budget, program narrative, required forms, and required attachments (*e.g.*, bylaws, an organization chart) to the Electronic Handbook ("EHB") records system maintained by HRSA. Bowers Decl. ¶ 11. For Soundview's service area, the Phase I deadline was September 19, 2011; the EHB deadline was October 3, 2011. *Id*. ¶ 12. The grant competition for that service area was for a five-year period commencing on February 1, 2012, and ending on January 31, 2017 (the "2012-2017 grant"); for FY 2012, the grant would provide the recipient with $1,876,258 in federal funds. *Id*.

There were three applicants for Soundview's service area: Soundview, Urban Health Plan, Inc. ("Urban Health"), and Union Community Health Center ("Union"). Union requested a waiver of the EHB deadline, citing difficulties uploading certain documents due to server errors; HRSA approved a waiver that permitted Union to submit an application by 5:00 p.m. on October 5, 2011. Bowers Decl. ¶ 14.

The applications were forwarded to HRSA's Division of Independent Review for review by an "objective review committee" ("ORC"). The ORC consisted of three members, each of

4

whom had been screened for conflicts of interest. Bowers Decl. ¶ 15. According to HHS, each ORC member reviewed each application; based on the review criteria set forth in the funding opportunity announcement, each member noted strengths and weaknesses and assigned each application a point score. The ORC then provided the program official responsible for the final selection with the average point score for the application and a summary of its strengths and weaknesses. According to HHS, Urban Health had the highest-scoring application. It was, accordingly, selected by the program official to receive the 2012-2017 grant. *Id*.

On January 12, 2012, HRSA sent a letter to Soundview notifying it that its application received a score of 78 (out of 100) in the competitive process. The letter further stated that that score had not been "sufficiently high" to prevail in the competitive process and that another applicant (whom it did not name and whose score it did not reveal) had won the 2012-2017 grant. The letter stated: "Please be assured that your application received full and fair consideration." Bowers Decl. Ex. D ("ORC Letter to Soundview").

The ORC Letter to Soundview attached a three-page "Objective Review Committee Final Summary Statement" which summarized, in bullet-point format, the strengths and weaknesses in its application, as identified by the ORC. These strengths and weaknesses were sorted under seven criteria: (1) need, (2) response, (3) collaboration, (4) evaluative measures, (5) resources/ capabilities, (6) governance, and (7) support requested. *See id*. In total, the letter identified seven strengths and 19 weaknesses of Soundview's. Many weaknesses identified by HRSA related to missing data, inadequate or missing explanations, and deficient internal controls. *See id.* at Criteria 1, 2, 4, 5, and 7.

Soundview's most recent grant expired by its own terms of January 31, 2012. The 2012-2017 grant to Urban Health became effective on February 1, 2012. Bowers Decl. ¶ 17.

5

### C. Soundview's Complaint

On January 31, 2012, hours before Soundview's most recent grant expired, Soundview filed its Complaint with this Court, purporting to bring claims against the defendants under: (1) the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*; (2) the federal question statute, 28 U.S.C. § 1331; (3) *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971); (4) the free speech and free association clauses of the First Amendment; (5) the Due Process Clauses of the Fifth and Fourteenth Amendments; (6) the Equal Protection Clause of the Fourteenth Amendment; (7) 42 U.S.C. § 1983; and (8) New York state law, for tortious interference with contract. As relief, the Complaint sought a preliminary injunction and a temporary restraining order preventing the defendants from terminating Soundview's existing grant. Compl. ¶ 1. The Complaint also sought $15 million in monetary damages. This figure, the Complaint alleged, reflected the monetary impact to Soundview of losing the grant. *Id*. ¶ 2.

In general, the Complaint alleged that HRSA's "objective review process" had been a "sham," was procedurally flawed, and had been "purposely designed to deny Soundview a grant opportunity it had been receiving for over 30 years." It broadly alleged that HRSA and the other defendants had passed over Soundview as a result of Soundview's "associations with its founder and previous Chief Executive Office[r], Pedro Espada." *Id*. ¶ 3.

The Complaint traced an escalating series of regulatory inquiries into, or adverse actions directed towards, Soundview, all of which, it alleged or implied, were substantively baseless, and derived from the organization's association with Espada. Specifically, the Complaint alleged, in 2009, after Espada led a "coup" in the New York State Senate by aligning himself with Republican rather than Democratic leadership, New York State's Medicaid Inspector General initiated an investigation into Soundview's finances. *Id*. ¶ 28. In 2010, HRSA demanded

detailed financial information from Soundview, indicating it was examining "the recent negative media attention [Soundview] had experienced and how those issues might impact Soundview's financial management of HRSA funds."  *Id.* ¶ 30.  Also in 2010, the New York Attorney General sued Espada, Soundview's chief financial officer Kenneth Brennan, and Soundview's then-Board of Directors.  *Id.* ¶ 31.  In 2011, HRSA requested that New York State health authorities look into grant expenditures to Soundview, and into the organization's "financial viability."  *Id.*  Finally, in 2011, New York State Medicaid officials issued a press release announcing their intention to exclude Soundview from the Medicaid program for three years for lacking a compliance program.  *Id.* ¶ 34.

As to the federal grant at issue here, the Complaint alleged that in September 2011, HRSA issued a notice of its intention to discontinue program funding of Soundview as a result of Soundview's "history of non-compliance with statutory and regulatory" requirements, and that it planned a competition to identify an organization that could receive a "new grant" and "carry out a service delivery program consistent with" federal regulatory requirements.  *Id.* ¶ 36.  This notice was soon rescinded based on a supplemental notice from an HRSA internal appellate board, which clarified that Soundview's existing grant would remain in force until its expiration date (January 31, 2012).  HRSA announced, however, that future funding for the period beginning February 1, 2012 would be decided by a competitive application process.  *Id.* ¶ 38.  Around this time, the Complaint alleges, a federal official, defendant Steven Auerbach of the National Health Service Corps, disclosed in an "off the record" conversation that for Soundview to "regain its status," Espada needed to step down.  *Id.* ¶ 39.  The Complaint is silent as to whether Espada did so.

As to HRSA's conclusions regarding Soundview's weaknesses (set forth in the attachment to the ORC Letter to Soundview), the Complaint alleges that these were "palpably incorrect." Among other things, the Complaint alleges, HRSA was wrong to state that Soundview did not maintain state Medicaid funding or malpractice coverage for its patients. *Id.* ¶ 40. The Complaint also stated that, in grading Soundview, HRSA appeared not to have analyzed existing doctor-patient relationships. *Id.* ¶ 41. Additionally, the Complaint faulted HRSA for addressing the ORC Letter to Soundview to Espada. *Id.* ¶ 40. The Complaint alleged that HRSA had improperly rebuffed Soundview's attempts to initiate discussions with HRSA about the company's financial integrity and about HRSA's concerns relating to Espada's role at the facility. Finally, the Complaint faulted HRSA for its alleged refusal to consider Soundview's request to extend its existing grant, correct errors Soundview had identified in the agency's grading of Soundview, or respond to Soundview's questions about the grant process. *Id.* ¶¶ 42-43.

Finally, the Complaint alleges, on January 25, 2012, a conference call was held between HRSA officials and representatives of Soundview. *Id.* ¶ 45. HRSA allegedly represented that "there was no process" in place to correct mistakes in its grading of Soundview and that HRSA's process for selecting the grant recipient was unappealable. *Id.* The Complaint alleges that, on the same call, HRSA disclosed that the winning applicant was Urban Health, but that HRSA refused to answer Soundview's inquiries into whether any facility associated with Urban Health was presently within the service area, although an HRSA staffer stated that by February 1, 2012, the start date of the grant, Urban Health would be able to provide services within the area. *Id.* HRSA confirmed on the call that Soundview's funding would cease upon the expiration of its existing grant, on January 31, 2012. *Id.* ¶ 47.

The Complaint also alleges that the winning applicant, Urban Health, which had not previously competed for a service area grant in Soundview's service area, *id*. ¶ 22, improperly "used lobbyists and political connections" to secure the grant, *id*. ¶ 27. The Complaint also disputes Urban Health's ability to deliver services effectively, arguing that the facilities owned by Urban Health are inconvenient for Soundview's low income patients to access. *Id*. ¶¶ 46, 48. It alleges that HRSA's decision to pass over Soundview will impair "quality care for over 20,000 low income patients." *Id*. ¶ 11; *see also* Pls.' Mem. of Law Addressing Issues Raised by the Ct. 7.

### D. Proceedings Before This Court

On January 31, 2012, the emergency part of this Court granted limited preliminary relief to plaintiffs: it enjoined the defendants from terminating the existing grant before its expiration at the end of that day. However, the Court did not grant relief as to the 2012-2017 grant, due to take effect the following day. Dkt. 3.

On February 1, 2012, the Court held an on-the-record conference with counsel, to discuss the proposed TRO as it related to the 2012-2017 grant. At the close of the conference, the Court directed counsel to brief whether the temporary relief plaintiffs seek—redirecting funds from the 2012-2017 grant from Urban Health to Soundview—is available as a matter of law.[5] The Court expressed the preliminary view that under the APA, even if plaintiffs could establish that HRSA's process leading to the selection of Urban Health over Soundview was deficient, the

---

[5] The Court also directed the parties to address whether the Court had jurisdiction over plaintiffs' claim, whether venue in this District was proper, and whether HRSA's decision constituted final agency action suitable for judicial review. The parties' submissions on these points are in agreement, and the Court agrees that jurisdiction and venue are proper, that the agency's decision was final, and that plaintiffs were not required to exhaust additional administrative remedies before filing suit.

9

appropriate remedy would be remand to the agency for further administrative proceedings consistent with the Court's opinion.

## II. Discussion

### A. Legal Standard for Issuance of a Temporary Restraining Order or Preliminary Injunction

A temporary restraining order, like a preliminary injunction,

> is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.

*Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)). Thus, a plaintiff seeking a temporary restraining order "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Psihoyos v. John Wiley & Sons, Inc.*, No. 11-cv-1416, 2011 U.S. Dist LEXIS 115835, at *3 (S.D.N.Y. Oct. 4, 2011) (citing *Winter*, 555 U.S. at 20). Here, plaintiffs seek not to preserve the status quo, as is the aim of prohibitive injunctions, but rather to have the Court issue a mandatory injunction, directing that the grant be reallocated. A party seeking a mandatory injunction has an even higher hurdle: "he must show a clear or substantial likelihood of success on the merits." *Fox v. Anthony*, No. 6:10-cv-839, 2010 U.S. Dist. LEXIS 86275, at *4 (N.D.N.Y. July 15, 2010) (citing *Tucker Anthony Realty Corp v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)) (internal quotation marks omitted). The party seeking the injunction carries the burden of persuasion to demonstrate, "by a clear showing," that the necessary elements are satisfied. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Finally, apposite here, a court may not order, as temporary relief, relief that would be unavailable after a final decision on the

merits.  *See, e.g.*, *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945) (finding injunction beyond power of the district court because it was not "of the same character as that which may be granted finally"); *Mason Tenders Dist. Council Pension Fund v. Messera*, No. 95-cv-9341, 1997 U.S. Dist. LEXIS 5931, at *15-16 (S.D.N.Y. May 1, 1997) (finding preliminary equitable relief appropriate because such equitable relief would likewise be appropriate upon a final adjudication on the merits).

### B. Analysis of the Available Remedies

Before analyzing whether plaintiffs meet the standard for a temporary restraining order, the Court must first determine whether the relief sought is of a nature the Court is empowered to grant.  In their request, plaintiffs ask the Court to order HRSA to redirect the 2012-2017 grant from Urban Health to Soundview.  The Court directed counsel to identify any authority indicating that it has the power to grant such relief.  Having carefully reviewed the parties' submissions, the Court concludes that the APA is the sole source of any remedies available to plaintiffs, and that the Court does not, under the APA, have the power to grant the requested relief, nor to halt the distribution of grant money to Urban Health.  Rather, assuming plaintiffs were to prevail on the merits of their claim that HRSA's process for selecting a grant recipient in Soundview's service area was flawed and hence unlawful, the sole remedy under the APA would be an order setting aside the agency's decision and remanding to the agency to conduct the process again, this time in compliance with the law and consistent with the Court's decision.  Accordingly, because the relief plaintiffs seek is unavailable, the Court must deny plaintiffs' request for preliminary mandatory injunctive relief.

### i. Scope of judicial review under the APA

Chapter Seven of the APA governs judicial review of agency action. A reviewing court's scope of review under the APA is outlined in 5 U.S.C. § 706, which reads:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> > (B) contrary to constitutional right, power, privilege, or immunity;
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> > (D) without observance of procedure required by law;
> > (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> > (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

Also potentially relevant here, § 705 of the APA gives courts the further power to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

### ii. Compelling the agency to award the grant to Soundview

Plaintiffs argue that § 706(1) confers on this Court the power to direct that HRSA divest Urban Health of the 2012-2017 grant, and award it instead to Soundview. The Court disagrees. That section applies only where "an agency failed to take a *discrete* agency action that it is *required to take*," *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original); here, HRSA had no legal obligation under the Act to award a grant to Soundview. In

*Norton*, the Supreme Court explained that an agency action "unlawfully withheld" means an action that the agency was legally compelled to take:  a "precise, definite act . . . about which [an official] had no discretion whatsoever." *Id*. at 63.  By contrast, the selection process at issue in this case is not ministerial.  Moreover, even if HRSA had no discretion to award the grant to a lower-scoring applicant, here, the grant was awarded to the highest-scoring applicant, Urban Health.  Unless and until a review of the administrative record reveals an infirmity with the process that yielded that result, that scoring outcome must stand.  Section 706(1) does not empower the Court to compel HRSA to award or rescind the grant, nor does any other section of Chapter 7 suggest a reviewing court may compel an agency to redirect grant funding.  Simply put, the Court lacks power under the APA, at this stage and upon a final adjudication on the merits, to compel the agency to award the 2012-2017 grant to any particular entity.

*Bowen v. Massachusetts*, 487 U.S. 879 (1988), on which plaintiffs rely, is not to the contrary.  In *Bowen*, the Court found it within a district court's discretion, under the APA, to reverse an HHS decision disallowing reimbursement to the state of Massachusetts for certain Medicaid expenditures.  The district court had reversed the agency's decision that particular expenditures were statutorily ineligible for reimbursement, finding that HHS had misinterpreted the language of the governing statute.  *Id.* at 888.  The Supreme Court observed that, as a result of the district court's opinion reversing the agency decision, it was "likely that the Government will abide by [the district court's] declaration and reimburse Massachusetts the requested sum."  *Id*. at 910.  However, the district court did not order such relief.  *Bowen* is an example of a decision to "hold unlawful and set aside agency action," *see* 5 U.S.C. §706(2), but it does not support plaintiff's request for an order affirmatively compelling HRSA to award money, let alone money that the agency was not demonstrably obligated to award.

13

### iii. Postponing the distribution of grant money to Urban Health or preserving pre-litigation status or rights

Nor does the Court have the power to order that the flow of FY 2012 grant money to Urban Health be stanched pending a full decision on the merits in this case. To be sure, § 705 of the APA empowers a reviewing court to order postponement of an agency action under review, or to otherwise act to "preserve status or rights," pending final judgment. But that remedy is of no assistance to Soundview, and, in any event, is inapplicable here.

To begin with, it is unclear how freezing the flow of grant money to Urban Health, even if merited, would assist Soundview. It is undisputed that Soundview's grant expired on January 31, 2012. Thus, even if the Court had the power under § 705 to effectively negate, or postpone the start date of, Urban Health's grant—which commenced on February 1, 2012—pending a final decision in this case and a potential administrative remand, that would not result in any money flowing to Soundview. Such an outcome would, therefore, do nothing to ameliorate Soundview's alleged injuries. It would serve only to create a vacuum in Soundview's service area, with no health center receiving federal funding under the Act during the pendency of this litigation.

In any event, § 705 does not apply to the facts at hand. Like Federal Rule of Civil Procedure 65, § 705 empowers courts to act to maintain the status quo. *Compare Salt Pond Assoc. v. U.S. Army Corp. of Eng'rs*, 815 F. Supp. 766, 776 (D. Del. 1993) (§ 705 "does not confer jurisdiction onto the Court to alter the status quo") *with Arthur Guinness & Sons, PLC v. Sterling Pub. Co.*, 732 F.2d 1095, 1099 (2d Cir. 1984) ("the purpose of a [Rule 65] preliminary injunction is to preserve the status quo pending the final determination of a dispute"). The status quo at the commencement of this lawsuit was that Soundview's grant was to terminate on January 31, 2012. There is no credible claim that Soundview had any vested right to the 2012-

14

2017 grant. Its right was instead to a fair process consistent with the APA, pursuant to which HRSA would determine the most worthy recipient of the 2012-2017 grant. Further, as of the start of this lawsuit, Urban Health had been awarded the 2012-2017 grant in Soundview's service area, effective February 1, 2012. To the extent § 705 may apply here to "preserve status or rights" during ongoing litigation, it could be invoked only to preserve that status quo, in which Urban Health received HRSA grant money. Thus, § 705 is, logically, no source of relief to Soundview in the present posture of this case.

> iv. Review of the administrative record and, if appropriate, a setting aside and remand of the agency action

Section 706(2) does empower courts to "hold unlawful and set aside agency action, findings, or conclusions" if they are, *inter alia*, unlawful, unconstitutional, or arbitrary or capricious. 5 U.S.C. § 706(2). That is the sole remedy available to plaintiffs under the APA. Plaintiffs have not, explicitly, sought this relief in their Complaint as drafted, which seeks only monetary relief, although at the February 1, 2012 hearing, plaintiffs appeared to seek such relief should their request for an order directing the 2012-2017 grant money to Soundview be denied. Were plaintiffs to seek relief under § 706(2), and were the Complaint to survive any facial challenge, the Court's charge would be to undertake careful review of the administrative record. Should the Court, upon such review, determine that HRSA's decision awarding the 2012-2017 grant to Urban Health should be set aside as unlawful, the proper remedy under § 706(2) would be to remand to the agency for further administrative proceedings. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007). The Court, of course, expresses no opinion at this stage as to whether or not HRSA's decisionmaking process did, or did not, comport with the APA.

## CONCLUSION

For the foregoing reasons, plaintiffs' request for a preliminary injunction and restraining order is denied.

In light of the public importance and time-sensitivity of plaintiffs' claims, the Court wishes to expedite this litigation. Therefore, within three days of the issuance of this Order, plaintiffs shall advise the Court and opposing counsel, in writing, whether they seek as a remedy a finding of unlawful agency action and a remand to HRSA to conduct proper proceedings to select the 2012-2017 grant recipient. Assuming plaintiffs seek such relief, they are directed, within 10 days of this Order, to file an amended complaint so stating, and setting out the basis on which this relief is sought.[6] The Court will thereupon schedule a conference with counsel to set an appropriate schedule for the remainder of this litigation. The federal government defendants are directed to compile the complete administrative record of the proceedings below and to file this record with the Court immediately upon the filing of any amended complaint.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: March 7, 2012
       New York, New York

---

[6] Plaintiffs are directed to serve all defendants promptly with any such amended complaint, as well as with a copy of this Opinion and Order. It appears to the Court that various defendants have not been served with plaintiffs' original Complaint.