**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

COMPREHENSIVE COMMUNITY DEVELOP-
MENT CORP. d/b/a SOUNDVIEW
HEALTHCARE NETWORK, et. al.,

**Plaintiffs,**

**– against –**

KATHLEEN SIBELIUS, both individually and
as Secretary of the U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et. al.,

**Defendants.**
-----------------------------------------------------------x

Docket No: 12 CIV 0776 (JAE)

Hon. Paul A. Engelmayer

Magistrate Judge
Andrew J. Peck

**ATTORNEY'S**
**DECLARATION**

---

## DECLARATION OF EZRA B. GLASER IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL COMPLETION OF THE ADMINISTRATIVE RECORD

**EZRA B. GLASER**, an attorney duly-admitted to practice law before the United

States District Court, Southern District, declares the following pursuant to 28 U.S.C.

§1746, and under the penalties of perjury and upon information and belief:

### I.      BACKGROUND

1.      That I am an attorney with the firm of CONDE & GLASER, LLP, and

serve as counsel for the Plaintiffs in the above-referenced matter.  I write in support of

the Plaintiff's motion to compel the completion of the administrative record by HRSA,

as submitted by the U.S. Attorney's Office in this matter, and to further allow the

supplementation of the administrative record.

2.      The case before the court centers on COMPREHENSIVE COMMUNITY

DEVELOPMENT CORP's various claims against state and governmental agencies, as

well as individuals employed by HEALTH AND HUMAN RESORUCES CORP. (herein after "HRSA") for wrongfully denying COMPREHENSIVE COMMUNITY DEVELOPMENT CORP (herein after "Soundview") a §330 grant, specifically due to HRSA's prejudices against Soundview for its associations with its founder and former Chief Executive Office (CEO), former New York State Senator Pedro Espada; that the defendants violated each of the Plaintiffs' due process rights, were arbitrary and capricious in their decision making processes, and were purposely designed to thwart the Plaintiffs rights under the U.S. Constitution – specifically, their First Amendment rights to free speech and association, their Fifth Amendment and Fourteenth Amendment right to due process of law, and their Fourteenth Amendment right to equal protection of the laws in addition to various state and federal laws.  Pursuant to these violations, Soundview seeks a reversal of HRSA'S decision and/or monetary damages.

3.      Presently at issue is the HRSA administrative record, as it serves as the centerpiece of this litigation.  The administrative record, as submitted by the U.S. Attorney's office, proves to be woefully inadequate, as it fails to include all of the documents and materials considered by the agency in reaching the challenged decision.  More significantly, it fails to include records that conclusively show the preexisting prejudice with which HRSA entered into the grant application process.

4.      HRSA ultimately awarded the §330 grant of the Public Health Service Act to DEFENDANT URBAN HEALTH INC., a competitor, who, to date, does not have medical facilities within the service area or catchment area[1], hence, could not serve

---

[1] The concept of a service or catchment area has been part of the Health Center Program since its beginning.  Although in general, the service area is the area in which the majority of the health center's

the targeted medically underserved population, as more than seventy six percent of Soundview's twenty thousand patients reside in the immediate vicinity and its location on a peninsula, cut off by two highways, presents a two-fare transportation challenge to those who reside there and need to use public transportation.  The very purpose of the Service Area Competition (SAC) is for a grantee to demonstrate its ability to provide medical care within this particular service area.  As the record will show, neither Urban or Union were able to demonstrate an ability to provide said services within this catchment area.

---

patients reside. the health center program's authorizing statute REQUIRES that each grantee periodically review its catchment area to (i) ensure that the size of such area is such that the services provided through the center (including any satellite) are **available and accessible to the residents of the area promptly** and as appropriate. See Public Health Service Act sec. 330 (k)(3)(J).

## II.   THE SHELL GAME OF THE GOVERNMENT: THE SPECIFIC INTENTION NOT TO PROVIDE NECESSARY INFORMATION

### (A)   *HRSA'S Actions Have Been Specifically Designed To Exclude Documents From The Record on its own accord*

5.   As an initial matter, it is clear that HRSA's actions have been specifically designed to exclude documents from the record on its own accord, hence further attempting to deny Soundview of its due process rights, as a review by this court of anything less than the entire administrative record would allow HRSA to withhold evidence supportive and favorable to Soundview's claims against the government.  To date, the U.S. Attorney's office has failed to provide information on how HRSA arrives at each applicants score in the Objective Review Committee's (ORC) Final Summary Statement.  These scores, among other pertinent information, cannot be determined from any portion of the administrative record and clearly prevent this Court from engaging in a substantial inquiry in determining if the agency's rulemaking was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, as required under the general standards of the Administrative Procedure Act, 5 U.S.C.S. § 706 (2) (A).

6.   The U.S. Attorney's office refers to Section VI of the Objective Review Manual[2], a document which was NOT part of the administrative record, and was e-mailed to your declarant, as the one document which could explain the score sheet results.  However, this is clearly untrue, as the Objective Review Manual, contains a broad description of the review process, but it fails to provide any details regarding HRSA's findings regarding these specific grant determinations.  The "Objective Review

---

[2]  Only portions of the objective review manual are annexed to this motion as Exhibit A, this document, which is over 500 pages, will be electronically filed with the court upon the filing of this motion.

Manual" provides duplicative information of the overall point value for each of the seven criterion. The following point values are assigned to each portion of the "Application Review Criteria" as it pertains to the review of the §330 grant application, totaling 100 points:

- Criterion 1: NEED (15 Points);

- Criterion 2: RESPONSE (20 Points);

- Criterion 3: COLLABORATION (10 Points);

- Criterion 4: EVALUATIVE MEASURES (15 Points);

- Criterion 5: RESOURCES/CAPABILITIES (20 Points);

- Criterion 6: GOVERNANCE (10 Points);

- Criterion 7: SUPPORT REQUESTED (10 Points).

7.     Additionally, the Objective Review Manual does not indicate any specifics involving the grading of the competing applications, i.e. how many points were deducted per applicant, per criterion or per field reader[3]. Further, it does not shine any light as to how the total points for each applicant were determined; it does not provide any indication as to how points were deducted based on an applicant's "weaknesses"; it does not show how points were allotted for each individual criterion based on an applicant's "strengths" and it does not show how points were awarded in each category.   Moreover, the administrative record is devoid of any of the following pertinent documents: Part I: Worksheet for Strengths and Weaknesses, Part II Reviewer Score Sheets, the Objective Review Summary Statements, the Chairperson Certification of Review Results, the Reviewer Evaluation Forms and HRSA Feedback

---

[3] Plaintiff will refer to the field readers as "reviewers" interchangeably as referred to in the case law.

Forms, this court will be hindered in its review (See Exhibits A, the Objective Review Manual) The government's refusal to admit said documents and materials are indicative of a strong showing of bad faith.[4]

### (B)    HRSA'S Actions Have Been Specifically Designed To Exclude Information Provided by Important Actors within the ORC Process.

8.    Within HRSA's "Objective Review Manual," the requirements of the committee members are provided in detail.  A Federal Review Administrator (RA) is responsible for compiling the worksheets of each of the "field reader[s]," and transferring the results into a single summary statement, and for calculating the overall score for each application.  Within this process, the RA is responsible for "deleting redundant comments, combining related points and noting disagreement among the field readers."  Where there is inconsistency in the viewpoints of individual field readers regarding the strengths or weaknesses of an application, the RA may contact them to "clarify" their comments.

9.    In addition to the RA, a Chairperson presides over the committee, a federal project officer serves as the "programmatic resource," a Summary Statement Operator (SSO), a Grants Technical Assistant (GTA), who must work with staff members of the Division of Grants Management Operations, namely defendant BRIAN FELDMAN.  Among the roles of the SSO is to prepare the draft summary statement "by compiling all assigned reviewers' written comments into one master document, listing application strengths and weaknesses by assigned reviewer for each criterion."  [Objective Review Manual, pp. VI-3-5]  At "face to face" meetings, said individual operates a laptop computer linked with a projector and projects the draft summary

---

[4] <u>Citizens to Preserve Overton Park Inc. v. Volpe</u>, 401 U.S. 402 (1971).

statement for each application; edits the summary statement language; prepares the summary statement for each application. [Objective Review Manual, p. VI-5]   In a teleconference meeting, the draft summary statement is provided to the participants the day before the meeting.   In web-assisted teleconference reviews, reviewers are able to see the draft statement on their own computers, via the internet.   It is at the Objective Review Committee meeting that the summary statement, consisting of strengths and weaknesses, is completed "during full discussion."

10.      Following review of the RA, this document becomes the official final summary statement document that "details the outcome of the review for HRSA staff and the applicant."  [Objective Review Manual, p. VI-5]

11.      The Summary Statement Operator must record notes from the post-review debriefing, and must provide the resulting notes in electronic form to the RA. [Objective Review Manual, p. VI-5]

12.      A "Worksheet For Strengths and Weaknesses" are provided for the reviewers [Objective Review Manual, p. AV.12, 3-5] This worksheet contains the categories of each of the criterion, and the strengths and weaknesses for the reviewer to note.  An "Objective Review Summary Statement" is provided by the agency, which allows the reviewer to indicate strengths and weaknesses for each criterion, or to indicate wither the criterion goals were "met."  There is also a section at the bottom of each of the criteria, where the reviewer may note "additional strengths" and "additional weaknesses" for each category.  [Objective Review Manual, p. AVI. 2-3]  A "Reviewer Scoresheet" provides a workspace for the reviewer to allot points for each of the criteria. [Objective Review Manual, p. AV.12, 6-7]    There is also a "Summary

Statement Checklist" within which the reviewer may indicate "exceptional strengths and significant weaknesses of the review criteria that are identified during the review of this application" [Objective Review Manual, p. AV.2, 2]. A "HRSA Reviewer Evaluation Form" allows the Chairperson to write an evaluation of the reviewer, and indicate whether the reviewer's work was adequately performed. [Objective Review Manual, p. AVI 8-2]. A HRSA Feedback Form for the reviewers allows comments on the grant application review process. [Objective Review Manual, p. AVI.8-3, 8-4]. Additionally, a "Chairperson Certification of Review Results" allows the Chairperson to record a "Record of Votes" for the applications, and a space to keep notes. [Objective Review Manual, p. AVI.3-1, 3-2, 3-3] These worksheets, though blank, are the only documents provided by HRSA which indicates scores for each of the criteria. We know, as a matter of HRSA policy, that each of these documents were collected from each of the reviewers and were not made part of the administrative record.

### VI.B.7. Disposing of Reviewers' Application Materials

Following the review, all application materials in the hands of reviewers must be appropriately disposed of. Review participants attending a face-to-face meeting must bring application materials with them to the meeting. At the conclusion of the meeting, review materials shall be placed in designated receptacles provided by the RA. Reviewers participating in teleconference review meeting, or, as field readers, must return applications and other hard materials to the contractor, or in special cases, to the federal RA… CD's and diskettes that contain non-erasable electronic files must be sent to the contractor or the federal RA.

13. As stated above, the following documents, which clearly were part of the overall record of the agency review, were not made part of the administrative record herein by the U.S. Attorney's Office:

- The draft Summary Statement, which was, in one form or another, projected at the ORC review Meeting;

- The SSO's notes from the post-review debriefing, and the resulting notes provided to the federal RA;

- All of the Worksheets for Strengths and Weaknesses provided by the reviewers;

- All of the Objective Review Summary Statements provided by the reviewers;

- All of the Reviewer Score-sheets provided by the reviewers;

- All of the Summary Statement Checklists provided by the reviewers;

- All of the HRSA Feedback Forms  provided by the reviewers to comment on the grant application review process.

- All of the Chairpersons evaluations of the reviewers;

- The Chairperson's Certification of Review Results;

- All of the application materials that were collected after the ORC review provided to the federal RA.

14.      It is furthermore respectfully submitted that it appears several Summary Statements had been prepared – the one originally by the SSO, from the initial reviewer scoresheets, for review at the ORC meeting; the one provided for the RA by the SSO for certification; and other possible drafts.  It also has not been made clear whether any minutes were taken at the meeting, other than the notes prepared by the SSO, or whether a recording or transcript was kept at the meeting.   Also, no documents are provided indicating how the RA reached the final calculations.

15.     It also has not been made clear whether any other documents might have been considered by the review committee.  Any documents presented to the reviewers other than the application itself are, of course, relevant – including e-mails, materials prepared for the review, or documents received by HRSA during the time this committee was engaged in the review.  This includes any documents that might have been received from other agencies, including press articles, or news stories related to Soundview; any e-mails from HRSA administrators, draft documents circulated within the agency, memorializations of telephone conversations, handwritten notes, or other documentation received by the committee.

16.     Since all documentation appears to have been collected, it all must be made part of the administrative record.

**III.    THE ERRONEOUS FINDINGS CONTAINED WITHIN SOUNDVIEWS  ORC SUMMARY SHEET POINTS TO THE NEED FOR ENLARGING THE ADMINISTRATIVE RECORD**

17.    It has been pointed out in the Plaintiff's papers initiating this action that serious errors were made within the ORC process that indicated prejudice by members of the committee in the final score received by Soundview.  Despite efforts by the Plaintiff to correct mistakes, including numerous phone calls to HRSA's attorneys, James Macrae himself, and various HRSA staff, Soundview was ultimately informed within a letter from James Macrae, dated January 12, 2012, that the §330 awarded to Soundview since 1978  would be terminated. [AR. pp. 00771]

18.    Specifically, among the most harmful negative findings of the ORC was the purported failure of Soundview to maintain Medicaid coverage on behalf of patients, and the failure to carry medical malpractice insurance.   Within the ORC Summary Statement as to Soundview's application, it is stated:

> The applicant organization does not demonstrate appropriate oversight authority in accordance with health center program requirements as demonstrated by the loss of FTCA health coverage and the loss of the Medicaid contract.  [AR p. 00763].

> In the very next bullet, in the "weaknesses" section, it is also erroneously noted that: The application does not sufficiently describe a plan for addressing the material weaknesses identified in the most recent external audit. [AR. pp. 00763].

> Remaining in the same section, it is again erroneously stated that:

> The application does not clearly demonstrate financial management capability or include strategies to maintain financial stability. [AR. pp. 00763].

19.     Within "Criterion 7: Support Requested," it is also erroneously stated that

Due to cuts in Medicaid funding, the organization has limited ability to maximize third party payers.

20.     The failure to have FTCA or Medicaid coverage would, of course, be an extremely detrimental fact in the determination of who should receive the grant.  Yet, both Medicaid and medical malpractice coverage has existed through this very day. The issue of continuation of coverage was, as this Court will remember, the very issue that served as the basis for the Plaintiff's request for a Temporary Restraining Order (TRO) to prevent medical malpractice insurance from being cut off (which did not expire until January 31, 2012, due specifically to HRSA's decision to terminate the §330 grant).  The Objective review committee had already made its decision before the ending of the grant period and could not have found that there was no coverage or no medicaid eligibility at that time. Furthermore, the Plaintiff's eligibility for Medicaid coverage continues through today.  It is true that the New York State Office of Medicaid Inspector General (OMIG) as well as the New York State Department of Health (NYSDOH) have attempted to cut off funding, which has been the subject of an action in New York State Supreme Court prior to the filing of this lawsuit (as well as the subject matter for bringing in the state defendants).  However, a stay has been issued by both Supreme Court Justice Mark Friedlander and the Appellate Division, indeed, continues through today.  A copy of the most recent stay of New York State Supreme Court Justice Friedlander and a copy of the stay of the Appellate Division of the New York State Supreme Court are annexed as Exhibit B.  The Appellate stay was granted

and was ordered to be perfected by September 2012, the stay contained the following language:

> Preliminary injunction, emergency relief and continuation of stay pending the appeal of the Department of Health decision to terminate Soundview from the Medicaid Program while stigmatizing Petitioners CCDC by unprecedented public dissemination of termination and factors in all media….without a stay, Petitioner would be deprived of essential funds and forced to cease operations, irreparably harming thousands of patients, employees and the community at large.

21.    Of equal import is the reference by the ORC that Soundviews application "does not sufficiently discuss a plan for addressing the material weaknesses identified in the most recent external audit."   However, this is totally erroneous as the most recent external audit stated that Soundview, in the auditors opinion, had complied,  in ALL material respects, with the requirements referred to above that are applicable to each of its major federal programs for the year-ended December 31, 2009.  [AR, pp.00223]

22.    The ORC, as has been repeatedly pointed out, has by definition utilized findings that were either the result of its own creation, or otherwise were privy to information from subordinates, the press and otherwise should not have had.  While the ORC process was hypothetically initiated for the purpose of reviewing the applications presented, it is clear the Objective Review committee was privy to extraneous and misleading information. While Your Declarant does not necessarily wish to impugn the individuals within the ORC that ultimately made these findings, there is every reason to impugn the process which led to these findings – and the fact that a review of extraneous, inaccurate information contaminated it.

23.    There are numerous documents that have become available to the Plaintiffs that must be considered as part of the administrative record.  This record cannot include only those documents that one person, namely James Macrae, swears was all that was considered in the review process.  It is all of the documents that were before the agency, as the case law reflects, which includes all documents that came before the ORC as well as the numerous documents passed between HRSA employees that indicates a specific intention to deny Soundview of the §330 grant.

24.    Within the previous section, numerous documents that are missing from the administrative record have been identified.  Provision of this documentation might provide some insight into how the ORC came to certain erroneous conclusions pertaining to the Soundview application process.  There is also a voluminous amount of correspondence between HRSA employees that indicates prejudice that developed toward Soundview – which includes references to depriving Soundview of the grant. All of this data must be considered by the court in coming to a fair determination as to whether HRSA and the department engaged in arbitrary and capricious behavior in the denial of the §330 grant to Soundview, and in awarding  the grant instead to a provider outside of the "catchment area." The numerous deficiencies that pertain to the submitted applications and the within erroneous ORC scoring are indicative of HRSA's arbitrary and capricious behavior, hence supporting a de novo review by this Court and the necessary completion of the administrative record.

**IV.    THE FINAL SCORES OF THE APPLICANTS POINT TO DEFICIENCIES IN THE ORC PROCESS, AND A NEED TO EXPAND THE ADMINISTRATIVE RECORD**

*(A)    The Clearly Improper Mechanism for Scoring Union Health Plan Indicates a Necessity to Expand the Administrative Record.*

25.     The numerous deficiencies that pertain to the submitted applications and the ORC scoring should indicate a need to expand the administrative record and the fact that the scoring resulted from an "arbitrary and capricious" standard.

**(REDACTED PORTIONS)**

26.     Under "Budget Justification" within the same section, it is noted that **(REDACTED PORTIONS)**

27.     There is a 10-point value under "Criterion 7 – Support," which, of course, encompasses the issues of the budget and staffing.  **(REDACTED PORTIONS)**

28.     **(REDACTED PORTIONS)**

**(REDACTED PORTIONS)**

**B.    The Clearly Improper Scoring of Urban, a Provider outside of the "catchment area," Indicates the need to expand the Administrative Record for court review.**

29.    HRSA, within a "Policy Information Notice, describes the service or "catchment" area as an ***integral*** part of the health center service program.  It is beyond question that both Urban and Union, even within the ORC's own critiques of their applications, indicated significant weaknesses due to the fact that neither of said organizations had any facility within the catchment area.  As to Union, the ORC found the following:

**(REDACTED PORTIONS)**

30.    With respect to Urban, the ORC noted the following as weaknesses:

**(REDACTED PORTIONS)**

31.    Such understatements as contained within the ORC findings are indicative of numerous defects within the application process, which must be subject to review by this court.  **(REDACTED PORTIONS)**

32.     Lastly, the question as to whether the downgrading of Soundview's score based on erroneous information as to its financial status and the loss of Medicaid and malpractice coverage in comparison to the scores of Union and Urban are, again, necessary – particularly with the provision of individual scoresheets and other extraneous information that was considered by the ORC during the review process.

**V.   THE RECORD MUST BE COMPLETED AND SUPPLEMENTED WITH EMAIL COMMUNICATIONS THAT CLEARLY INDICATE A PREJUDICE TOWARD SOUNDVIEW AND THE SPECIFIC INTENTION OF DENYING SOUNDVIEW FUTURE GRANT OPPORTUNITIES**

33.    Due to the provision of discovery in the criminal trial of Pedro Espada, certain email communications between several HRSA employees were brought to fruition. A description of those e-mails, which were exchanged by several HRSA employees, including named Defendants in this action, follows.   This includes Defendant Brian Feldman, HRSA Grants Management Specialist, Division of Grants Management Operations, a HRSA official directly involved in awarding the grant. These email exchanges are representative of HRSA's desire to prevent Soundview from receiving grant awards due to their distaste for the political actions of then State Senator Pedro Espada.  It indicates a specific prejudice that remains outside of the scope of the ORC review, and the manner in which the ORC reached a final determination specifically due to the wishes of these agency officials.

34.    Annexed as Exhibit C are the several e-mail exchanges of HRSA employees, referred to below.   An email from Defendant, Brian Feldman, Grants Management Specialist, Health Services Branch, Division of Grants Management Operations, to Defendant Suganthi Walter, and HRSA employees Fran Gedney, Lisa Ayoub, Helen Harpold, Marianne Cappacchione and Jack Egan, dated August 1, 2008 is instructive:

> If they do not have their audit in by the time of the competition, couldn't we close them out? If that is not an option, we could withhold their renewal, as Fran and I discussed yesterday, until after they submit their FY 2007 audit… If they don't have it in by 2/1/2009 (the date of their next renewal), we could hold up their award, provided they even receive it. Could we discuss this?

35. Indeed, this email not only points to a prejudice in the awarding of the grant. It represents a clear effort to have discussions to find a way to deprive Soundview of the grant – which is the precise viewpoint expressed in Plaintiff's moving papers from the onset of this lawsuit: that the entire ORC process was a complete sham, and where a decision by HRSA to deprive Soundview of the grant had been arrived at before that process was initiated.

36. An email from Defendant, Brian Feldman, to Defendant Suganthi Walter, (which ultimately appears to have been circulated to HRSA Team Leader Vera Messina and HRSA employee Helen Harpold), dated January 5, 2009, is equally instructive, which references a news article that was published several days earlier:

Court: Espada Personally Liable For Campaign Violations
December 30, 2008
An appellate Court ruled today that Senator elect Pedro Espada, Jr. and his campaign treasurer Kenneth Brennan, can be held personally liable for $61,750 worth of penalties for 22 campaign finance violations connected to his failed 2001 Bronx borough president bid. This is a reversal of a lower court decision that found only some violations could be properly imposed on the candidates himself, while others could only be brought against the committee.

37. In a follow-up email, Defendant Brian Feldman states to Ms. Messina: "This is the article I mentioned before. Kenneth Brennan is the CFO that I normally deal with on all grants related issues." In a response email from Ms. Messina, it is stated: "wow – I wouldn't want him running any grantee health center…"

38. Another set of email exchanges between Defendants Brian Feldman and Suganthi Walters, dated August 11, 2009, supports the notion that HRSA

employees exhibited prejudice toward Soundview in the awarding of the

grant.  The subject of the initial email from Mr. Feldman states: "Subject:

Vote for Pedro."  Under "news,"  once again quoting a news article, the Mr.

Feldman's e-mail reads:

<u>Son of key Senate coup figure gets state job</u>
Published: Tuesday, August 11, 2009 10:30 a.m.
Albany (AP) - A New York Senate spokesman confirms that the son of a
powerful state senator now has a $120,000 job in the chamber.

Now New York magazine online first reported that Senate Majority leader
Pedro Espada's son, Pedro G. Espada, now holds the newly created job
of Senate liason between governments.

A spokesman for the Senate's Democratic majority confirmed Tuesday
morning that the younger Espada, a former state assemblyman, had
been hired by the Senate.

The elder Espada is the dissident who created a June coup in the Senate
when he joined a Republican led- coalition, taking the slim majority from
his Democrat party in exchange for a lucrative leadership post.

Five weeks later, he returned to the Democrats, giving them the majority
again in exchange for another lucrative leadership post.

A response email from Defendant Suganthi Walters states: "Ha….Ha….there

seems to be no end to nepotism in this circus act!"

39. An email from HRSA employee Sherry Angwafo to HRSA employees

Timothy Coyle and Patricia Reese, dated January 14, 2010, is particularly

poignant.  Discussing a news article on an investigation by the New York

State Attorney General's Office, Ms. Angwafo states:

I found another article on Comprehensive Community Development
Corp. d/b/a Soundview (132960287).   The article contains specific
allegations  by  the  NYAG  concerning  Soundview  and  possible

misappropriation of grant funds.  The e room recommendation is fund without restrictions or conditions (the grantee is on draw down).  In light of all that is going on with this grantee, is this still a valid recommendation.

40. The email sent in response from Gina Capra, HRSA's Eastern Division Director of Bureau of Primary Health Care, to HRSA counsel Pamela Kurland and Beverly Dart, and HRSA employees Sherry Angwafo, Tracey Orloff, Jack Egan and Kirsten Argueta, also dated January 12, 2010, further supports this position.    Referring to a news article on an investigation by the attorney General's Office, Ms. Capra states:

FYI - Wanted you all to see this latest news clip regarding Pedro Espada, CEO of Soundview/CCDC in NY. This is the grantee and CEO who generated interest from multiple federal and state entities in 2009.

41. These email exchanges indicate a feeling of necessity by HRSA to deprive Soundview of funding.  It also supports that HRSA clearly passed along its prejudicial feelings toward Mr. Espada to the entire Board of Directors of Soundview and all of its professional medical staff, that the ORC process was a sham, and that the charges as it relates to Mr. Espada must be true for Soundview as well.  The New York State's Attorney General's Office merely started an investigation – which, if true, should have meant that Mr. Espada should no longer act as the CEO of the corporation, and face criminal prosecution – as he does this very day.    However, the notion that simply reading the charges and then deciding that if something – anything – is reported in our press, it must be true, is where the disservice and ultimate prejudice toward Soundview and its patients begin.    A

consideration of these emails by the court, as part of the administrative record, is absolutely crucial for a fair review.

**VI.   THE DOCUMENTS REQUESTED ARE CLEARLY NECESSARY FOR THE COURTS REVIEW, BASED ON SUPREME COURT PRECEDENT.**

42. The case law on what constitutes the administrative record of an agency determination before a review court is far more expansive than the documentation that the U.S. Attorney's Office has presented to this court. It is well-settled that all of the communications requested as part of the expansion of the administrative record must be included for the court's review.

43. While it is clearly correct, as the U.S. Attorney's office points out, that judicial review is limited to what was before the administrative agency at the time that an agency determination was made, the U.S. Supreme Court and the circuit courts have provided a much more expansive definition of what the administrative record constitutes.  "It is well settled," the Court has held, "that judicial review of agency action is generally restricted to the full **administrative record** before the agency at the time the decision was made. The focal point for judicial review should be the **administrative record** already in existence, not some new **record** completed initially in the reviewing court." <u>Olamide Olorunniyo Ore v. Clinton,</u> 675 F. Supp. 2d 217, 2003.   It is respectfully submitted that in the present case, the U.S. Attorney's office have severely narrowed its definition of what constitutes "the full administrative record before the agency" with the purpose of restricting necessary documents that were clearly part of the agency review process.

**(A)**   **The Presumption of Regularity Usually Accorded to the Reviewing Agency's Submission of the Administrative Record is Overshadowed by Intentional Exclusion of Documents from the Record.**

44. The standard of review of agency action under §706 of the Administrative Procedure Act (APA)[5] as developed by the U.S. Supreme Court, derives from the decision of Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971), which ordered the reviewing court to engage in a "substantial inquiry" to determine whether the standards of the APA had been satisfied in an agency's submission of an administrative record, with respect to construction on parkland.  The court held:

> Thus, it is necessary to remand this case to the District Court for plenary review of the Secretary's decision.  That review is to be based on the full administrative record that was before the Secretary at the time he made his decision.  But since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable.

45. In Overton, the court also ruled that the reviewing court "may require the administrative officials who participated in the decision to give testimony explaining their action," where there is evidence of bad faith on the part of the agency.  Citizens to Preserve Overton Park v. Volpe, at 420.  This finding is based on the position that where there is a showing of bad faith by the agency, the reviewing court has lost any reason to trust the agency.  This standard has been enforced by all of the circuit courts.  See, e.g., Ad

---

[5]  Indeed, much of the case law is directed toward §330(2)(f) of the APA, which provides no further clarification then providing that an agency action must be set aside because it is "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

Hoc Metals Coalition v. Whitman, 227 F. Supp. 2d 134 (U.S.D.C., 2002), Bar MK Ranches v. Yuetter, 994 F.2d 735 (U.S. Ct. of Appeals, 10th Circuit, 1993). Community for Creative Non-Violence v. Lujan, 908 F. 2d 992 (D.C. 1990).

46. The Plaintiff's position in the case at bar is strongly supported by Citizens to Preserve Overton Park, at 419, and its progeny in the federal courts. Amfac Resorts, L.L.C. v. U.S. DOI, 143 F.Supp. 2d 7, 11 (D.D.C. 2001), holds that "a party can establish that the administrative record is incomplete" …if, inter alia, "the agency may have deliberatively or negligently excluded documents that may have been adverse to its decision." In Bar MK Ranches v. Yuetter, 994 F.2d 735 (10th Cir. 1993), the court similarly held that "an agency may not unilaterally determine what constitutes the Administrative Record, nor can the agency supplement the Administrative Record submitted to the district court with post hoc rationalizations for its decision." American Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 539 (1981), Citizens to Preserve Overton Park, at 419. In certain cases, where a showing is made that the record may not be complete, limited discovery is appropriate to resolve that question. Tenneco Oil Co. v. U.S. Department of Energy, 475 F.Supp. 299, 317 (D.Del.1979).

47. Indeed, the presumption of regularity becomes shifted to the agency where bad faith can be shown in the context of an incomplete record. In Portland

Audobon Society v. Oregon Lands Coalition, 984 F.2d 1534 at 1548 (9th Cir. 1993)

48. The standard created in Portland Audobon Society further enunciated the very problem facing the Plaintiffs here: "If the record is not complete, then the requirement that the agency decision be supported by 'the record' becomes almost meaningless." See HBO v. FCC, 567 F.2d 9, 54 (D.C. Cir.1977).    See Buschmann v. Schweiker, 676 F.2d 352, 358 (9th Cir.1982); Marathon Oil Co. v. Environmental Protection Agency, 564 F.2d 1253, 1271-72 (9th Cir.1977)."

49. The Ninth Circuit has also held, in Thompson v. U.S. Department of Labor, 885 F. 2d 551 (9th Cir. 1989), that "the whole administrative record is not necessarily those documents the agency has compiled and submitted as the administrative record.    The whole administrative record therefore consists of all documents and materials directly or indirectly considered by agency decisionmakers and includes evidence contrary to the agency's position." Thompson v. U.S. Department of Labor, 885 F. 2d 551 (9th Cir. 1989).  See also Exxon v. Department of Energy, 91 F.R.D. 26 (N.D. Tex. 1981), holding that the "whole" administrative record must necessarily include "all documents and materials directly or indirectly considered by agency decision-makers and includes information contrary to the agency's position."

50. The courts have repeatedly held that the reviewing court cannot adequately discharge its duty to engage in a substantial inquiry into agency

action if it is simply required to take the agency's word that relevant issues were considered.  The courts have therefore imposed a duty for the court to consider "relevant factors" in an agency analysis.   In <u>Asarco v. United States Environmental Protection Agency</u>, 616 F.2d 1153, 1160 (9th Cir. 1980), the Ninth Circuit Court of Appeals held:

> It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not. The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters.

51. For this reason, the Supreme Court, based on <u>Citizens to Preserve Overton Park v. Volpe,</u> as well as the circuit courts, have imposed a duty to obtain further information through the use of affidavits and other fact-finding devices where an incomplete record exists. <u>Camp v. Pitts,</u> 411 U.S. 138 (1973).  In certain circumstances, reviewing courts are permitted to admit evidence outside of the record, where: (1) admission of the records are necessary to determine "whether the agency has considered all relevant factors and has explained its decision"; (2) where "the agency has relied on documents not in the record"; (3) where it is necessary to supplement the record to "explain technical terms or complex subject matter," or (4) where plaintiffs make a showing of agency "bad faith." <u>Southwest Ctr. for Biological Diversity v. United States Forest Serv.,</u> 100

F.3d 1443 (9th Cir. Ariz. 1996).   See also <u>Lands Council v. Powell</u>, 395

F.3d 1019, 1030 (9th Cir. 2005).[6]

52. There are certain obvious reasons for why this court must consider the

"whole record" that was before the agency, and not simply what Mr. James

Macrae, as the Associate Administrator of HRSA, states it was.  It is not

only the position of the Plaintiffs that his own position, as a person part of

an agency that intended on depriving Soundview of the §330 grant, but

because the whole issue revolves around the ***agency's*** actions that took

place in considering Soundview's eligibility for the grant.   The prejudice

exhibited toward Soundview precedes his declaration by several years.

53. Mr. Macrae's own credibility alone is to be questioned; it is also highly

questionable whether he is the right person to submit such an affidavit,

who simply took the ORC summaries, accepted its findings, rubber-

stamped those findings, and, in turn, robotically awarded the grant to

Urban while depriving it to Soundview based on erroneous, arbitrary and

capricious findings.

54. Indeed, the federal courts have held that the "whole record" must be

provided to allow a complete de novo review of agency action.  In <u>Portland</u>

---

[6] With specific reference to the administrative record, the Supreme Court has held that
"an agency's action is arbitrary and capricious if the agency fails to consider an
important aspect of a problem, if the agency offers an explanation for the decision that
is contrary to the evidence, if the agency's decision is so implausible that it could not
be ascribed to a difference in view or be the product of agency expertise, or if the
agency's decision is contrary to the governing law (citing the APA, 5 U.S.C. § 706).
<u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29 (1983), <u>Lands
Council v. Powell</u>, 395 U.S. 1019, (9th Cir. 2005).

Audobon Soc'y v. Endangered Species Comm., 984 F.2d 1534 (9th Cir. 1993), it was held by the Ninth Circuit that "Section 706 of the APA provides that judicial review of agency action shall be based on "the whole record." Thompson v. United States Department of Labor, 885 F.2d 551, 555-56 (9th Cir.1989) holds that "The whole record" includes everything that was before the agency pertaining to the merits of its decision.   In Home Box Office, Inc. v. Federal Communications Commission, 567 F.2d 9, 54 (D.C.Cir.1977), the District of Columbia Circuit Court went as far as holding that an incomplete record must be viewed as a "fictional account of the actual decisionmaking process."   Where it appears the agency has relied on documents or materials not included in the record, supplementation is appropriate. Public Power Council v. Johnson, 674 F.2d 791, 794 (9th Cir.1982). The government cannot rely on cases to deny supplementation of the record with information on the merits that was never presented to the agency.   Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976); Walter O. Boswell Memorial Hospital v. Heckler, 749 F.2d 788 (D.C.Cir.1984). Furthermore, supplementation is proper where the material the Plaintiff wishes to have included in the record includes documentation that was allegedly before the agency.  In PATCO v. FLRA I, 672 F.2d 109, 112-13 (D.C.Cir.1982), the Court of Appeals for held that the administrative record must be supplemented with undisclosed ex parte communications.   Similarly, in Bethlehem Steel Corp. v. Environmental

Protection Agency, 638 F.2d 994, 999-1000 (7th Cir.1980), the Seventh

Circuit held that supplementation of the record was appropriate where the

documents sought to be admitted related to improper ex parte

communications.   The court held:

It is clear that this court has the legal authority to order the
supplementation of the record where "anything material to any party is
omitted from the record," Fed.R.App.Pro. 16(b), or where the
supplementation is necessary for effective judicial review of the agency's
actions. Citing U. S. Lines v. Federal Maritime Commission, 189 U.S.
App. D.C. 361, 584 F.2d 519 (D.C.Cir.1978), Bunker Hill Co. v. EPA, 572
F.2d 1286 (9th Cir. 1976), Home Box Office v. FCC, 185 U.S. App. D.C.
142, 567 F.2d 9 (D.C.Cir.1977), cert. denied, 434 U.S. 829, 98 S. Ct. 111,
54 L. Ed. 2d 89.

55. In  Grolier, Inc. v. Federal Trade Commission,  615 F.2d 1215 (9th

Cir.1980), the Ninth Circuit held that where an Assistant Law Judge had

worked as staff attorney for Federal Trade Commission during the relevant

time period, discovery regarding alleged improper contacts should be

allowed.

56. This is, of course, a case where ex parte communications between

members of the ORC and other HRSA staff are not only alleged; such

communications appear quite clearly to have occurred.  This is supported

by the submission of the e-mails passed between HRSA staff that shows

extreme prejudice toward Soundview itself; even an outright desire to deny

the grant.  The entire decision-making process was in fact a "fiction," and

clearly, review of the whole record here is necessary – which, as has been

stated, must include all of the information provided by the reviewers in the

context of examining the actual scores of the competing applicants for the

§330 grant.   As a prima facie matter, the Plaintiff has already shown irregularities, bad faith, and arbitrary and capricious behavior which necessitates completion and supplementation of the record by HRSA.

**(B)**   ***The Complete Failure of the DHHS to Include Important Documents that were "Directly" or "Indirectly" Considered by the Agency is a Fatal Flaw to the Defendants Position.***

57. It has been argued by the U.S. Attorney's Office that certain e-mails and notes of agency personnel are not appropriate for inclusion in the administrative record.  This argument, particularly as it pertains to the facts of this case, is patently incorrect.  As an initial matter, as established in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971), the court is entitled to consider the "bare record."  This includes, again, any relevant factors entering into an administrative determination.   This necessarily involves a determination as to whether the record contains "all documents and materials directly or indirectly considered by the agency." Bar MK Ranches v. Yuetter, 994 F.2d 735, 739 (10th Cir. 1993). Wildearth Guardians v. United States Forest Serv., 713 F. Supp. 2d 1243 (D. Colo.2010) has held that where the agency decisionmaker (hypothetically, James Macrae) based his decision on the work and recommendations of subordinates, those materials should be included in the administrative record.   The four-part test of Southwest Ctr. for Biological Diversity v. United States Forest Serv., 100 F.3d 1443 (9th Cir. Ariz. 1996) and Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir. 2005) is equally applicable here, where the bad faith of an agency is at issue; where specific

employees of HRSA demonstrated and actual intention of denying Soundview future grants and grant opportunities even prior to the announcement of the grant by the agency; and where the crucial documentation as to how the agency arrived at its score is completely absent from the record.

**WHEREFORE,** it is respectfully submitted that Plaintiff's motion should be granted in its entirety.

Dated:     New York, New York
           April 30, 2012

_____
**EZRA B. GLASER, Esq. (EG 3953)**