UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                   :

COMPREHENSIVE COMMUNITY DEVELOPMENT    :
CORP., d/b/a SOUNDVIEW HEALTHCARE NETWORK :
et al.,                                :
                                               :         12 Civ. 0776 (PAE)
                    Plaintiffs,  :
                                           :         <u>OPINION & ORDER</u>
           -v-                    :

KATHLEEN SEBELIUS, both individually and as    :
Secretary of the U.S. Department of Health and Human :
Services (DHHS) et al.,                :
                      Defendants.   :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Plaintiff Comprehensive Community Development Corp., d/b/a Soundview Health Care Network and its fellow plaintiffs (collectively, "Soundview") move to expand the administrative record in this Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, case. For the reasons that follow, the motion is denied.

**I.    Background**

        The background to this case is set out in detail in the Court's decision of March 7, 2012 (the "Injunction Decision"). (Dkt. 19.) The Court assumes familiarity with that decision.

        In brief, Soundview challenges a grant funding decision by the Health Resources and Services Administration ("HRSA"), an operating division of the United States Department of Health and Human Services ("HHS"). HRSA was charged with awarding grant funding under the Health Center Program (the "Program") to an eligible health center in the Bronx, New York, service area, for the period 2012–2017. In January 2012, HRSA awarded the grant to Urban

1

Health Plan, Inc. ("Urban Health"). Soundview, which had been awarded the predecessor grant, contends that, had HRSA properly evaluated the competing grant applications, it would have prevailed.

Soundview filed this lawsuit on January 31, 2012, hours before its predecessor grant expired and hours before, on February 1, 2012, the grant to Urban Health became effective. On March 7, 2012, the Court denied Soundview's motion for preliminary injunctive relief. Soundview had sought an order directing that HRSA redirect, from Urban Health to Soundview, funds under the 2012–2017 grant. (Dkt. 19.)

On April 6, 2012, HRSA filed the administrative record in connection with its grant award. (Dkt. 27.) It did so to permit the parties to brief the merits of Soundview's APA claim, and the Court to determine whether the grant award decision violated the APA.

On May 2, 2012, Soundview moved to expand the administrative record. (Dkt. 42.)[1] Soundview's brief supporting that motion takes the form of a declaration from its attorney, Ezra Glaser, Esq. It argues that the record as compiled by the Government is "woefully inadequate" and "fails to include all of the documents and materials considered by the agency in reaching the challenged decision." Declaration of Ezra Glaser, Esq. ("Glaser Decl.") ¶ 3 (Dkt. 42). In particular, Soundview argues that the record was "specifically designed," *id.* ¶ 5, to exclude records that show that HRSA approached the grant application process with a predisposition against Soundview, as a result of what Soundview has termed its "associations with its founder and previous Chief Executive Office[r], Pedro Espada." Compl. ¶ 3; *see also* Glaser Decl. ¶¶ 33, 41. Among other things, Soundview contends that because Urban Health's medical facilities were significantly less conveniently located than Soundview's—Soundview contends, in fact,

---

[1] Soundview styles its motion as one "to compel completion of the administrative record." (Dkt. 42.)

2

that Urban Health lacked *any* such facilities within the defined service area—Urban Health necessarily could not have prevailed over Soundview on the merits. Glaser Decl. ¶ 4.

On May 24, 2012, HRSA responded. It argued that to the extent Soundview identified specific types of documents ostensibly missing from the record, they were not among those considered by the agency in deciding to award the 2012–2017 grant to Urban Health. It further argued that Soundview had failed to make the showing of bad faith required for the Court to direct the production of, or consider, extra-record evidence. (Dkt. 48.)

## II.     Discussion

### A.     Applicable Legal Standards

Under the APA, a court that reviews agency action to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), is to "review the whole record or those parts of its cited by a party." *Id.* § 706. Courts have consistently held that the term "the whole record" refers to the full record that was before the agency, meaning the agency decision-maker, at the time of the decision.

For example, where the issue at hand was the decision by the Secretary of the Interior to authorize construction of a highway through a public park, the Supreme Court remanded for plenary review by the district court of "the full administrative record that was before the Secretary at the time he made his decision." *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1971). Lower courts have, similarly, held that the relevant materials "before the agency" are those that the agency decision-makers directly or indirectly considered. *See, e.g.*, *State of Delaware Dep't of Natural Res. and Envtl. Control v. U.S. Army Corp. of Eng'rs*, 772 F. Supp. 2d 535, 541 (D. Del. 2010); *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps. of*

*Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) ("this Court has interpreted the 'whole' record; to include 'all documents and materials that the agency 'directly or indirectly considered' . . . [and nothing] more or less"; "in other words, the administrative record 'should not include materials that were not considered by agency decisionmakers'") (citations omitted; ellipses and brackets in original); *State of New York v. Shalala*, No. 93-cv-1330, 1996 WL 87240, at *6 (S.D.N.Y. Feb. 29, 1996).

It is, further, settled that deference is due to the agency's judgment as to what constitutes the whole administrative record. "It is the province of the agency to compile and submit the administrative record for review by the Court," *State of Delaware*, 722 F. Supp. 2d at 541–42, and "[c]ommon sense dictates that the agency determines what constitutes the whole administrative record because it is the agency that did the considering, and that therefore is in a position to indicate initially which of the materials were before it—namely, were directly or indirectly considered." *Pac. Shores*, 448 F. Supp. 2d at 5 (internal quotation marks and citation omitted). As with its execution of other official duties, an agency's designation of the administrative record "is generally afforded a presumption of regularity." *State of Delaware*, 722 F. Supp. 2d at 542; *see also Pac. Shores*, 448 F. Supp. 2d at 5. (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739–40 (10th Cir. 1993)) (additional citation omitted). Supplementation of the record as designated by the agency is, thus, the exception, not the rule. *State of Delaware,* 722 F. Supp. 2d at 542; *Pac. Shores*, 448 F. Supp. 2d at 5.

Requests by a party to put materials before the Court that are outside the administrative record filed by the agency fall into two distinct categories. *Pac Shores,* 448 F. Supp. 2d at 5–6. First, the party may seek to show that materials exist that were actually considered by the agency decision-makers but are not in the record as filed. To rebut the presumption of administrative

4

regularity, such a party must show that the materials sought to be added were before the agency *decision-maker*. It is not enough to show that these materials were somewhere within the agency, *see id.*; *see also State of New York*, 1996 WL 87240, at *6, because "interpreting the word 'before' so broadly as to encompass any potentially relevant document existing within the agency . . . would render judicial review meaningless." *Fund for Animals v. Williams*, 245 F. Supp. 2d 49, 57 n.7 (D.D.C. 2003).

Alternatively, a party may ask that the court consider extra-record evidence, *i.e.*, evidence that was not necessarily considered by the agency. However, a court may review extra-record evidence only where "there has been a strong showing in support of a claim of bad faith or improper behavior on the part of the agency decision-maker or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (citing *Overton Park*, 401 U.S. at 420).

### B. The HRSA Review Process

The Court first describes the review process used by HRSA to award the 2012–2017 grant. Understanding that process is key to (1) understanding the parties' arguments with respect to the administrative record, and (2) identifying the agency decision-makers.

HRSA's process administering the service area competition ("SAC") for the Bronx began on June 14, 2011, when the agency issued a "Funding Opportunity Announcement" ("FOA"). The FOA detailed the eligibility requirements, review criteria, and awarding factors for organizations seeking a Health Center Program grant. Applications were then submitted to HRSA, following which an initial screening review took place for eligibility, completeness, and responsiveness. All three applicants for the 2012–2017 grant in the Bronx service area—

Soundview, Urban Health Center, and Union Community Health Center, Inc. ("Union")—cleared that review. *See* HRSA Br. 2–3; Declaration of Beatriz Gramley ("Gramley Decl.") ¶¶ 1–5; *see also id.* at Ex. 2 (Objective Review Manual describing procedures with respect to grant applications) ("ORM"); Administrative Record ("AR") 000746-000760.

From that point, the review process was conducted by an "objective review committee" ("ORC") consisting of three experts, each with relevant training and experience. Each had been screened to avoid a conflict of interest. Each was responsible for providing an objective, unbiased evaluation of the three applications, based on the review criteria set out in the FOA. In addition, a chairperson was selected, not to score applications, but instead to lead the ORC by moderating discussions of the applications to ensure fair consideration of each. *See* HRSA Br. 3; *see generally* ORM at pp. IV-5, IV-9, V-2, V-5.

An additional HRSA official, a "review administrator," participated in the process, but solely to address administrative issues. These included developing review schedules, identifying and recruiting the ORC members and screening them for conflicts of interest, and monitoring review discussions. The review administrator as to the Bronx SAC was Beatriz Gramley. Gramley has served at HRSA as a review administrator since 2008. *See* Gramley Decl. ¶¶ 1–2.

Gramley organized the review process by the ORC members. On October 7, 2011, she sent each ORC member a letter. It contained all the information they would need to complete and submit their application reviews, and notified them that the committee meeting would be held on November 14, 2011, by web-assisted teleconference. *See id.* ¶ 6. Gramley's letter included a substantial set of documents, largely addressing HRSA procedural considerations, *id.* ¶ 7, and directed the reviewers to a review-specific website containing other documents. *Id.* ¶ 8.

6

Each reviewer accessed the applications through HRSA's Application Review Module ("ARM") system, to which they each had password-protected access. *Id.* ¶¶ 8–9.

On October 18, 2011, the reviewers participated in an orientation phone call; on October 21, 2011, each submitted their conflict-of-interest and confidentiality certifications. Thereafter, each independently evaluated the applications using, on the review-specific website, an "Objective Review Worksheet" and an "Initial Score" sheet. *Id.* ¶¶ 10–12. The three reviewers submitted these worksheets by email to a contractor from Humanitas, Inc., a consulting firm with which HRSA contracts to assist with SACs. By November 7, 2012, each had entered their initial scores into the ARM system. *Id.* ¶ 13. Thereafter, a different Humanitas employee known as the Summary Statement Operator ("SSO") merged the comments from the reviewers' three Objective Review Worksheets into a master document for each application, listing application strengths and weaknesses by reviewer for each criterion, and distributed the merged document to the reviewers. *Id.* ¶ 14.

The ORC then met through a web-assisted teleconference led by the chairperson. *Id.* ¶ 15. Present at the meeting, but not involved in the deliberations, were the review administrator (Gramley), the two Humanitas employees (the lead contractor and the SSO), two representatives from the Office of Program and Policy Development ("OPPD") in HRSA's Bureau of Primary Health Care ("BPHC"), and a grants management specialist. *Id.* During the teleconference, the SSO projected the merged worksheet on the review website, and the chairperson led the reviewers through a discussion of the strengths and weaknesses of each application. Each reviewer also provided his or her own initial scores, by criterion and overall. *Id.* ¶ 16. The reviewers then suggested edits to the summary statements for each application based on their discussions, and the SSO entered the edits to create a final summary statement for each

application. The reviewers next submitted in ARM their final scores, by criterion and overall. *Id.* The chairperson then certified the review results. *Id.* Following the ORC deliberations, the chairperson and the reviewers participated in a debriefing concerning the technical aspects of the SAC, and the chairperson completed the reviewer evaluation forms. *Id.* ¶ 19.

Using the overall final scores submitted by the three reviewers, the review administrator then determined the average score for each application and created a rank order list. *Id.* ¶ 18. HRSA's Division of Independent Review then transmitted the rank order list and the final summary statement to the OPPD. *Id.* Urban Health was first on the rank order list for the Bronx SAC.

The final step in the process leading to the award to Urban Health centered on James Macrae, the Associate Administrator of the BPHC. Macrae serves as the "Authorizing Program Official" for competitive and non-competitive grant applications. *See* Declaration of James Macrae ("Macrae Decl.") ¶ 2. In that capacity, he was responsible for awarding the 2012–2017 grant as to the Bronx SAC. In late November 2011, Macrae received from the OPPD a rank order list which reflected the results of the ORC's evaluation and scoring of the three Bronx SAC applications, in which Urban Health was ranked first. *Id.* ¶ 3. OPPD had reviewed the ORC's evaluation. It determined, and reported to Macrae, that there were no reasons not to authorize the award of the 2012–2017 grant to the highest ranking application. *Id.* ¶ 4. Macrae thereupon authorized the award of the 2012–2017 grant to Urban Health. *Id.* ¶ 5.

On January 12, 2012, Macrae notified Urban Health that its application had been selected for funding. The same day, Macrae wrote Soundview and Union, informing them that the scores assigned to their application had not been high enough for them to prevail. With each of the letters, Macrae included the final summary statement for the relevant application, which reflected

the ORC scores and strengths and weaknesses, as agreed upon by the reviewers, for each criterion.  *See* AR 00761-00773.

  **C.**  **Analysis**

  The first and most substantial category of materials which Soundview seeks to add to the administrative record are materials that shed light on the evolving assessments of the individual ORC reviewers or otherwise reflect the ORC's deliberations prior to its decision.  These include (1) draft summary statements; (2) the individual reviewers' worksheets for strengths and weaknesses; (3) the individual reviewers' score sheets; (4) the reviewers' summary statement checklists; and (5) the chairperson's certification of review results.  *See* Glaser Decl. ¶¶ 13–15.  In the same vein, Soundview seeks to discover information as to whether "any minutes were taken at the meeting . . . or whether a recording or transcript was kept at the meeting."  *Id.* ¶ 14.  Soundview further argues that "[a]ny documents presented to the reviewers other than the application itself are, of course, relevant—including emails, materials prepared for the review, or documents received by HRSA during the time this committee was engaged in the review," including "documents that might have been received from other agencies, including press articles, or news stories related to Soundview; any emails from HRSA administrators, draft documents circulated within the agency, memorializations of telephone conversations, or other documentation received by the committee."  *Id.* ¶ 15.

  Soundview is correct that, in the context of a civil litigation conducted pursuant to the Federal Rules of Evidence, in which the various inputs into and basis for a body's decision were decisive issues, many such materials would likely be relevant.  But this case entails review of agency action under the APA.  And, in such review, the standard discovery tools of civil litigation—including depositions, interrogatories, and, germane here, wide-ranging document

production of materials that may potentially lead to admissible evidence—do not apply.  *See, e.g.*, *Tafas v. Dudas*, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008) ("'There is a strong presumption against general discovery into administrative proceedings.'") (quoting *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 195 (3d Cir. 2006)).

Rather, in an APA review, the Court is called upon to make a more limited determination whether a particular agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This inquiry examines the agency's action "'based on the agency's stated justification, not the predecisional process that led up to the final, articulated decision.'"  *Tafas*, 530 F. Supp. 2d at 794 (quoting *Ad Hoc Metal Coal. v. Whitman*, 227 F. Supp. 2d 134, 143 (D.D.C. 2002)); *see also In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279 (D.C. Cir. 1998) (the "actual subjective motivation of agency decisionmakers is irrelevant as a matter of law" absent a showing of bad faith or improper behavior).

For this reason, courts have consistently recognized that, for the purpose of judicial review of agency action, deliberative materials antecedent to the agency's decision fall outside the administrative record.  *See, e.g.*, *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1549 (9th Cir. 1993) ("neither the internal deliberative process of the agency nor the mental processes of individual agency members" are proper components of the administrative record); *Tafas,* 530 F. Supp. 2d at 794 ("'internal memoranda made during the decisional process . . . are never included in a record'") (quoting *Norris & Hirshberg v. SEC*, 163 F.2d 689, 693 (D.C. Cir. 1947); *Amfac Resorts, LLC v. Dep't of the Interior*, 143 F. Supp. 2d 7, 13 (D.D.C. 2001) ("deliberative intra-agency memorand[a] are ordinarily privileged and need not be included in the record")).

This line of authority, excluding deliberative materials from the administrative record, has two distinct purposes. First, as noted, it reflects that it is the agency's articulated justification for its decision that is at issue; the private motives of agency officials are immaterial. *See In re Subpoena Duces Tecum*, 156 F.3d at 1279. Second, not including such materials advances the functional goal of encouraging the free flow of ideas within agencies, with agency employees not inhibited by the prospect of judicial review of their notes and internal communications, which could otherwise render "agency proceedings . . . useless both to the agency and the courts." *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,* 789 F.2d 26, 44–45 (D.C. Cir. 1986).

Applied here, these principles justify the non-inclusion of the various pre-decisional materials sought by Soundview. These include the individual reviewers' worksheets and initial score sheets; the non-final draft of the agency's summary statement; and emails and other documents that might bear upon the agency's pre-decisional process. *See, e.g.*, *Ad Hoc Metals Coalition*, 227 F. Supp. 2d at 142–43 (denying plaintiffs' request to supplement the record with internal EPA emails exchanged during rulemaking process); *Tafas*, 530 F. Supp. 2d at 796–97 (holding that internal agency emails, correspondence, summaries, drafts, works in progress, and analysis evidencing the agency's initial formulation of the rules at issue are "prime examples of deliberative materials that are immaterial as a matter of law and need not be included in the administrative record").

This decision leaves Soundview fully capable of challenging HRSA's grant award on the merits. The administrative record includes, *inter alia*, the applications submitted by the three grant applicants; the rank order list generated based on the evaluation and scoring of the SAC applications by the ORC; the final summary statements reflecting the ORC's evaluation of and

final scores for each application, keyed to each criterion; and the letters sent to each applicant articulating the basis for the ORC's decision.[2]

The second category of materials that Soundview seeks to add to the administrative record are post-review evaluations of the administrative process. *See* Glaser Decl. ¶ 13. These feedback forms consist of forms which reviewers may complete to comment on the grant application review process, evaluations which the chairperson may complete to comment on the reviewers, and the SSO's notes from his or her post-review debriefing. *Id.* The Court denies this motion. First, HRSA represents that the ORC reviewers did not complete their feedback forms and thus these do not exist. Gramley Decl. ¶ 19. Second, in any event, these forms (exemplars of which HRSA has furnished the Court) do not solicit information relevant to the evaluation or scoring of the Bronx SAC applications. Instead, the forms elicit feedback, largely technical, relating to the review process. *Id.* ¶ 19. And these post-decision documents necessarily were not considered by the ORC in evaluating and scoring the applications or by Macrae in ultimately authorizing the award of the 2012–2017 grant to Urban Health. *See, e.g.*, *Pac Shores*, 448 F. Supp. 2d at 6–7 (excluding from the administrative record materials not considered by agency decision-makers).

Soundview, third, seeks to add a series of other documents bearing some connection to the review process. These include news stories relating to Soundview, emails within HRSA relating to Soundview or the other applicants, draft documents circulated within HRSA, memorializations of phone conversations, and various handwritten notes. *See* Glaser Decl. ¶ 10.

---

[2] Various materials that Soundview seeks cannot be added to the administrative record for an independent reason—they do not exist. HRSA represents that no recordings, transcriptions, or minutes of the ORC were made, *see* Gramley Decl. ¶ 17, and that the individual reviewers did not complete summary statement checklists. *Id.* ¶ 12. The Court has no reason to doubt, and Soundview has given the Court no reason to doubt, the accuracy of this representation.

These materials are properly excluded from the administrative record because there is no non-speculative basis on which to find that they were considered by the ORC in evaluating and scoring the applications or by Macrae in making the ultimate award decision.  *See* Gramley Decl. ¶ 12.  As discussed above, the administrative record does not consists of materials before any employee in the agency, but rather, the agency decision-makers.

Fourth and finally, Soundview attaches to its motion a number of emails among HRSA employees that were produced in connection with the recent criminal prosecution of Espada, Soundview's founder and former chief executive.  *See* Glaser Decl. Ex. C.  One 2008 email, from Brian Feldman, a grants management specialist, discusses the possibility of "clos[ing] out" Soundview if an audit of Soundview was not complete as of the time of the competition; another email, from Feldman, copies a newspaper article recounting Espada's alleged campaign finance violations; and a third email, from an HRSA "team leader," Vera Messina, writes, of Espada, "I wouldn't want him running any granting health center."  *Id.*; *see also* Glaser Decl. ¶¶ 34–37; *id.* ¶¶ 38–40 (describing other emails).  Soundview argues that these emails reflect prejudice against, or "distaste" for, Soundview, because of Espada's apparent corruption and misappropriation of funds.  *See id.* ¶¶ 2, 19.  Soundview moves that these emails be added to the administrative record.

For two reasons, the Court denies Soundview's motion.  It is true that these emails reflect a judgment by some agency personnel that Espada was corrupt and had mismanaged—and was ill-qualified to manage—a grantee health center.  *See, e.g.*, *id.* ¶ 39 (quoting email from HRSA employee Suganthi Walters, stating, "Ha . . . Ha . . . there seems to be no end to nepotism in this circus act!").  But, first, there is no evidence whatsoever, and Soundview does not claim, that these emails were ever given to the ORC reviewers or Macrae.  And, the case law is clear that

13

materials seen by agency personnel but not the decision-makers are not part of the agency record. *See* pp. 3–5, *supra*.

Second, as HRSA notes, none of these emails has anything to do with the 2012–2017 grant at issue in this case. *See* HRSA Br. 16. Rather, the emails are all from 2008–2010. Most relate to subjects other than grant funding. These include whether to restrict Soundview's ability to draw down federal funds, as a result of an outstanding audit; whether restrictions should be placed on Soundview's present funding; and the reactions of HRSA employees to an article reporting various improprieties or questionable behavior on Espada's part. The only emails that refer to grants are (1) a 2008 email, referencing the grant period beginning February 1, 2009, as to which Soundview received funding; and (2) a January 2010 email, referencing a news article reporting allegations by the New York State Attorney General regarding possible misappropriation of grant funds awarded to Soundview. Both of these emails long predate the grant application period for the 2012–2017 grant, which commenced October 3, 2011. Addition of these materials to the administrative record is, therefore, not warranted.

In so ruling, the Court does not mean to suggest that concerns that the agency's actual decision-makers may have had about Soundview flowing from its management track record under Espada are irrelevant to the grant process for 2012–2017. Quite the contrary: As noted in the Court's earlier ruling in this case, ORC's letter to Soundview, reporting that Soundview had not received the 2012–2017 grant, identified among Soundview's weaknesses its deficient internal controls. *See* Injunction Decision 5. It is entirely possible that that finding reflected a judgment by the agency decision-makers that there had been mismanagement at Soundview under, or attributable to, Espada, and that this mismanagement legitimately raised questions about the quality of Soundview's current controls. That issue, however, is not before the Court.

Pending briefing on the merits of Soundview's APA claim, and the Court's review of the administrative record, the Court reserves judgment on whether HRSA's scoring of Soundview's grant application was within its discretion, and whether a factual basis (whether or not flowing from Espada's actions at Soundview) existed for the agency's various findings of weaknesses.

The final issue raised by Soundview is a claim that HRSA acted in bad faith, so as to justify eliciting and considering extra-record material. This claim is easily put to one side. Closely analyzed, Soundview's arguments as to bad faith consist of merits arguments as to why HRSA, purportedly, misapplied various review criteria, or misinterpreted information in the competing grant applications. *See, e.g.*, Glaser Decl. ¶¶ 18–32. However, to establish bad faith requires a strong showing; this showing is not made out by the mere fact that a court may disagree with the agency on the merits or find error, procedural or substantive, by the agency decision-maker. *See, e.g.*, *Sierra Club v. U.S. Army Corps. of Eng'rs*, 701 F.2d 1011, 1044 (2d Cir. 1983). On the contrary, it well-established that an agency's alleged errors in the decision-making process do not themselves establish bad faith. *See, e.g.*, *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003); *Four Points by Sheraton v. United States*, 63 Fed. Cl. 341, 344–45 (Ct. Fed. Cl. 2005).

The Court has reviewed the various arguments by Soundview as to factual and legal errors committed by HRSA; it has also reviewed HRSA's responses to these claims. The Court will not pass judgment on these contentions pending merits briefing on Soundview's APA claim. It suffices to say that, based on the Court's review, the claims of error raised by Soundview, considered separately or in combination, do not come close to rising to the level necessary to support a fair inference of bad faith. Expansion of the administrative record on this ground is, therefore, not merited.

## CONCLUSION

For the reasons stated in this Opinion, Soundview's motion to enlarge the administrative record is denied. The Clerk of Court is directed to terminate the motion at docket number 41.

The parties are directed to meet and confer and to jointly propose, within one week of this Opinion, an expeditious briefing schedule as to Soundview's claims under the APA. If the parties cannot agree on such a schedule, they are directed, also within one week of this Opinion, to submit competing proposed briefing schedules to the Court.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: July 20, 2012
New York, New York